*Volume I*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

    Plaintiff,                     Case No. 3:20-cr-86-TJC-JBT

vs.                                May 10, 2022

JORGE PEREZ, et al.,               8:55 a.m.

    Defendants.                    Courtroom No. 13A

_____

JURY TRIAL PROCEEDINGS
(VOLUME I)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT COURT JUDGE

COURT REPORTER:

    Shannon M. Bishop, RDR, CRR, CRC
    221 North Hogan Street, #150
    Jacksonville, FL  32202
    Telephone:  (904)549-1307
    dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

*Volume I*

2

APPEARANCES

GOVERNMENT COUNSEL:

**ANDREW TYSEN DUVA, ESQ.**
US Attorney's Office - FLM
300 North Hogan Street, Suite 700
Jacksonville, FL  32202

**GARY A. WINTERS, ESQ.**
United States Department of Justice
1400 New York Avenue NW
Washington, D.C.  20902

**JAMES V. HAYES, ESQ.**
Department of Justice, Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.  20902

COUNSEL FOR DEFENDANT JORGE PEREZ:

**THOMAS M. BELL, ESQ.**
Thomas M. Bell, PA
301 West Bay Street, Suite 1460
Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

**RICHARD J. LANDES, ESQ.**
Richard Landes, Esq.
736 2nd Street North
Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

**BRIAN T. RAFFERTY, ESQ.**
BakerHostetler
1170 Peachtree Street NE, Suite 2400
Atlanta, GA  30309-7676

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

**SETH SCHWARTZ, ESQ.**
**ALBERT J. TASKER, IV, ESQ.**
Schwartz Law Group, PA
10365 Hood Road, Suite 105
Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

      **CALEB D. ROWLAND, ESQ.**
      Rowland Law
      2130 Riverside Avenue
      Jacksonville, FL  32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

      **STEVEN H. SADOW, ESQ.**
      **VINCENT ALBERT CITRO, ESQ.**
      Steven H. Sadow, PC
      260 Peachtree Street NW, Suite 2502
      Atlanta, GA  30303

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

      **JOSHUA SABERT LOWTHER, ESQ.**
      Lowther Walker, LLC
      Centennial Tower
      101 Marietta Street NW, Suite 3325
      Atlanta, GA  30303

COUNSEL FOR DEFENDANT AARON ALONZO:

      **DARCY D. GALNOR, ESQ.**
      Galnor Shumard, PA
      121 West Forsyth Street, Suite 610
      Jacksonville, FL  32202

*Volume I*

4

T A B L E   O F   C O N T E N T S

Page No.

PROCEEDINGS:

Jury sworn......................................... 19
Opening Statement by Mr. Duva..................... 35
Opening Statement by Mr. Bell..................... 64
Opening Statement by Mr. Landes................... 89
Opening Statement by Mr. Rafferty................ 100
Opening Statement by Mr. Schwartz................ 118
Opening Statement by Mr. Rowland................. 128
Opening Statement by Mr. Sadow................... 133
Opening Statement by Mr. Lowther................. 155
Opening Statement by Ms. Galnor.................. 156

N O   E X H I B I T S   R E C E I V E D

```
 1    are almost impossible to enforce, but I try, especially --
 2    because we're going to take a break for lunch after this next
 3    argument.
 4              MR. RAFFERTY:  I'm just going to get Mr. Durall.
 5              THE COURT:  That's fine.  Sure.
 6              Are they ready?  Oh, really?  Okay.  All right.
 7         (All parties present.)
 8              THE COURT:  All right.  Let's have the jury, please.
 9              COURT SECURITY OFFICER:  All rise for the jury.
10         (Jury enters, 12:00 p.m.)
11              THE COURT:  All right.  Everybody may be seated.
12    Thanks.
13              Do we have everybody?
14              Okay.  Mr. --
15              MR. SADOW:  Sorry, Your Honor.  Thank you.  Sorry for
16    the interruption.
17              THE COURT:  No problem.  Five-minute breaks are hard
18    to enforce.  It's a little bit hard to -- but since we're going
19    to take a lunch break after this, I thought we'd...
20              All right.  Mr. Schwartz, are you going to be making
21    an opening statement on behalf of Mr. Porter?
22              MR. SCHWARTZ:  Yes, sir.
23              THE COURT:  All right.  You may proceed.
24              MR. SCHWARTZ:  Thank you, sir.
25              Good afternoon.  My name is Seth Schwartz.  And I
```

1    represent James Porter, along with Albert Tasker, who's my

2    co-counsel.

3              I'm not going to take that long, but I want to talk

4    about the sensational claims that the government made when they

5    got up here.  $1.4 billion, and then tells you, Well, that was

6    claims, and 400 million was paid.  That's not unusual in health

7    care.

8              A doctor does a procedure, bills $1,000.  The

9    insurance company comes back, pays 300 bucks.  Happens all the

10   time.  It's not a big deal.  So don't let the government tread

11   on your emotions.  That's what they're trying to do.  1.4

12   billion, but we're really talking about 400 million.

13             Pay attention to the actual evidence, not the

14   emotional part of what the government is going to try to give

15   you.

16             Mr. Porter made a few million dollars not just as

17   part of this business arrangement, but as a lab owner handling

18   all of the contracts that he had prior to this business

19   arrangement.

20             He didn't make $400 million like what the government

21   is trying to sell, a couple million dollars, no different than

22   he made previously.

23             What he did was completely legal, 100 percent legal.

24   You'll hear evidence of all of this.  The contracts allowed it.

25   The provider manuals that explain to the providers what they

1    can and can't do allowed it.

2           You saw the e-mail from RightCHOICE/Anthem, which is

3    a parent of the Blues, among Florida Blue and Georgia Blue and

4    BlueCross Missouri, and all these other Blues, that says, We

5    can't hold them to the pass-through rule because the contract

6    doesn't prohibit it.  These contracts allowed it.

7           You'll hear a term called CMS, Center for Medicare &

8    Medicaid Services.  It is a federal series of rules and

9    regulations.  The federal government promulgates those rules.

10   CMS guidelines allowed it.

11          You'll hear evidence that when a contract is silent,

12   you go to CMS guidelines to figure out what's allowed and

13   what's not.  CMS guidelines allowed it.  All of this was

14   absolutely legal.

15          The government talked about they're going outside of

16   their geographical areas and boundaries.  There is nothing in

17   the law, nothing in the contracts, that limits a geographical

18   area, nothing.  You will not hear any evidence that says that

19   the law says that you have to stay within a certain

20   geographical confine.  It doesn't exist.

21          There were over 1,000 -- over 1,000 separate

22   independent medical doctors that made decisions on signing

23   these orders, very similar to prescriptions, asking for this

24   testing, for a variety of reasons, independent doctors.  You

25   will hear no evidence that my client had anything to do with

 1   paying those people, providing any kind of benefit to them,

 2   bribing them, or anything else.

 3            They made these decisions as independent medical

 4   doctors because they needed to test their patients the way that

 5   they needed that done.

 6            You heard the government talk about giving samples at

 7   Quest or Labcorp.  You'll hear evidence how those big companies

 8   send samples all over the place.

 9            Just because an individual goes to a Quest in

10   Jacksonville doesn't mean that that test is done in

11   Jacksonville.  That test could be done in California.  It could

12   be done in New York.  It goes all over the place.  That's

13   normal in the health care field.  There's nothing nefarious

14   about what my client did.

15            And, again, even Anthem, the parent company for the

16   Blues, said, We can't hold them to this pass-through because

17   the contract is silent as to it.

18            You'll hear the term pass-through billing.  The

19   government is going to use that.  All pass-through billing is

20   is subcontracting.  Hospitals subcontract every day.

21            The evidence is going to show that to you.  It is not

22   unusual for a hospital to subcontract out services that it

23   performs.  It's done regularly.  That's all that this was, were

24   a series of subcontract agreements.

25            The government didn't tell you that the hospitals did

1    make money.  The hospitals absolutely made money.  All of these

2    hospitals were in terrible debt before it started.  In fact,

3    Putnam is still in business today, doing well.  It was on the

4    verge of destruction before my client assisted with Putnam.

5           All of this testing was fully disclosed in the claims

6    that were filed.  The labs were listed.  The codes that

7    identify -- and you'll learn a lot about these different codes,

8    but the codes that identify the type of testing that was done

9    was fully disclosed.

10          And those codes are designed by the federal

11   government.  CMS, Center for Medicare & Medicaid Services,

12   creates codes and creates billing forms to keep everything

13   universal.

14          And the way hospitals bill is what's called a UB-04,

15   Universal Billing 2004.  That's the updated version.  And those

16   forms have very specific boxes.  And within those boxes very

17   specific information has to go.  And certain things can go and

18   certain things can't go.  And so all of those codes were

19   followed.

20          The insurance companies were put on notice of all of

21   this stuff.  You'll hear about the 141 code.  The 141 code

22   designates a nonpatient billing.  You've got inpatient,

23   outpatient, and then you've got a nonpatient.  A nonpatient is

24   somebody that never appeared at the facility, but yet their

25   specimen, in this case urine, did, and was tested.

1        And you heard Mr. Rafferty talk about code 22.  That

2   is super, super important.  The reason it's so important is

3   because it was never put on any of the claims that my client or

4   the other defendants filed, never.

5        And the reason it was never put there is there wasn't

6   a spot for it, yet that was the basis of this entire

7   investigation.

8        And you'll hear evidence of how, when the grand jury

9   was talked about -- or when these individuals talked to the

10  grand jury, they talked about code 22.  And they talked about

11  the importance of code 22.  And there were a number of

12  witnesses that talked about code 22.

13       And what code 22 tells you is that the place of

14  service, like Mr. Rafferty said, where the urine was collected,

15  or where the blood was collected, was at the hospital, boots on

16  the ground in the hospital.

17       That was made up by the insurance companies.  It will

18  appear nowhere in the original billing data.  It was created by

19  the insurance companies.

20       And you'll hear information how the insurance

21  companies knew about that, didn't disclose it to the defense,

22  don't know if they disclosed it to the government, but it was

23  100 percent made up.  It never came from any of these

24  defendants.

25       My client hired a number of attorneys, but

1   specifically one.  His name is Mark Thomas.  He is board

2   certified by the Florida Bar in health care law.  Basically,

3   he's an expert in health care law.  He's considered a board

4   certified specialist.  He is one of about 130 health care board

5   certified specialists in the state Florida, one of 130, out of

6   over 100,000 lawyers in the state of Florida.

7           He formerly worked for the Florida Attorney General

8   and the Medicaid fraud section as its chief.  He also was a

9   legislative attorney for the Florida Senate.  And he advised my

10  client on what he could and couldn't do.

11          And not only did he give him an opinion.  He wrote

12  the contracts.  And he said, Follow the contracts.  It will be

13  okay.  You'll be fine.  You're operating well within the bounds

14  of the law.  And so that's what my client did.  He followed

15  those contracts just like a roadmap.

16          This is an individual that is an expert in health

17  care law.  He has worked for the State pursuing fraud.  He

18  knows what he's doing.  And he wrote the contracts for my

19  client to follow.  And my client followed those contracts,

20  absolutely followed them.

21          There was a lot of money that was put into Putnam

22  Community Hospital to get the lab up and going, to expand

23  things, lots of money.  These machines are not cheap.  They're

24  very, very expensive instruments.

25          All of the information that comes with them is

1    expensive.  The directors that run these things and the PhDs

2    and the scientists that run them are very expensive.  Lots of

3    money was put into this organization.  It was a legitimate

4    organization, kept legitimate records, had legitimate e-mails.

5           None of this was nefarious.  None of this was in the

6    shadows.  This was not an intent to defraud.  It was a

7    legitimate business that operated well within the contracts and

8    well within the confines of law.

9           Let's talk about the dirty real quick.  Let's talk

10   about what Mr. Rafferty was talking about with the CGH server

11   that the FBI had in their possession and came back and said,

12   Oh, nothing to see here.  We didn't find anything.  The FBI.

13          They were provided this server by the hospital, yet

14   they couldn't find anything on it.  But when the defense team

15   opened it up, there was a pile of information related to all

16   the testing that was done.

17          The testing in this case was actually done.  There's

18   no evidence to suggest it wasn't done.  It was done.  All of

19   those tests were ordered by independent physicians.  Not one or

20   two doctors that operated in, you know, some shadow, but by

21   over 1,000 separate doctors, all of these tests were done.

22          The case agent that was in charge of this entire

23   investigation -- that's the person at the top, the case agent.

24   FBI Agent Robert Schwinger handled this investigation for

25   years, error after error after error.  You're going to hear

1   evidence of all of that.

2          Right before the indictment dropped -- the indictment

3   dropped, I believe, in May of 2020.  April of 2020, Agent

4   Schwinger retires from the FBI.  In May of 2020, he becomes the

5   manager of fraud investigation for Florida Blue.

6          He could have worked anywhere in the country,

7   anywhere in the world.  Just happens to land at Florida Blue.

8   And you're going to hear of all of the errors that, quote, he

9   didn't catch, yet somehow he winds up -- not as an entry-level

10  person, but as a manager of the fraud investigation unit at

11  Florida Blue.

12         Please pay attention to all of the evidence.  The

13  government gets to go first.  And they put on all of their

14  witnesses.  When they're done, then the defense teams get to

15  go.

16         So until all of the evidence has been presented,

17  you're not going to be able to see all of it.  Please don't

18  make up your mind or start thinking a certain way until you've

19  seen everything.  Because there's a lot of moving parts here.

20         This case is full of reasonable doubt.  The whole

21  basis of the indictment was predicated on information that was

22  false, provided by the insurance companies.  And you'll hear

23  the number of witnesses that testify to the grand jury and how

24  much effort they put into that false information.  And you're

25  going to see that it was absolutely false.  There is reasonable

1    doubt everywhere.

2            My client operated a legitimate business with

3    legitimate attorneys and legitimate CPAs and legitimate

4    contracts and corporate structure.

5            I believe that when you come back, after hearing all

6    of the evidence, with your deliberations, you're going to find

7    the only thing that you can come back with is a not guilty

8    verdict.

9            Thank you.

10           THE COURT:  Thank you.

11           Mr. Rowland, I'm thinking about letting you go ahead

12   and go now, if that -- if that will be all right, since that

13   was such a -- a shorter opening statement.

14           Are you prepared to do that?

15           MR. ROWLAND:  I'm fine with that, Your Honor.

16           THE COURT:  Everybody okay?

17           MR. ROWLAND:  I think the jury might want to get

18   lunch.

19           THE COURT:  Go ahead?

20           JUROR:  No, keep going.

21           THE COURT:  Okay.  We're going to go ahead, sir.

22           MR. ROWLAND:  Yes, sir.

23           THE COURT:  Thank you.

24           And then I promise we'll get lunch after this one.

25   But please give Mr. Rowland the same attention you've given

1    everybody else.

2            And you may proceed when you're ready, sir.

3            MR. ROWLAND:   Thank you, Your Honor.   May it please

4    the Court?

5            Ladies and gentlemen, I'm going to be very quick,

6    because, like I said, I think you probably want to get to

7    lunch.

8            I have the distinct pleasure and privilege of

9    representing Mr. Sean Porter, who's been sitting next to me the

10   entire time.

11           I'm not going to belabor any of the points on the

12   billing.   I'm not going to belabor any points on any of the

13   very technical aspects of this, because my client is charged

14   with three crimes, two counts of money laundering and one count

15   of conspiracy to money launder.

16           And since he was introduced by the government as the

17   money launderer, I want to make sure you know who he is.

18           You're going to hear testimony that Mr. Porter is a

19   father, a husband, a legitimate business owner.   He and his

20   brother, James Porter -- I know it's been referenced, but I'm

21   going to be very explicit so you understand who everyone is --

22   have worked together for almost 40 years; in that time, had

23   several businesses.

24           But what we're looking at right now is -- beginning

25   in 2012, began working for Pinnacle Labs.   And then in 2013,

1  Mr. Porter created a company, TYSI, LLC.  That company was

2  providing essentially medical marketing.

3          My co-counsel Mr. Rafferty kind of hit this on the

4  head.  There's a reason that you weren't told certain things.

5  There's a reason that we're having to come to you and tell you

6  those things.  And it's because those pieces of information

7  don't fit in to the government's case.

8          Not just reasonable doubt, doubt, as in, Why wouldn't

9  I have heard that?  For example, the e-mail from Ms. Burch

10 talking about the fact that RightCHOICE has a contract that

11 doesn't say that what a lot of these people were doing they

12 couldn't do.  That's a huge part of this.

13         Some other points real quick -- you'll hear testimony

14 that none of the provider agreements said that the individuals

15 who were involved in the billing couldn't do what they were

16 doing.

17         Now, I want to also back up to another thing that

18 several of my co-counsel have said.  And that's focusing on the

19 $1.4 billion.  That's a lot of money.  That's, what, nine

20 zeros?  It's an incredible amount of money.  400 million in

21 claims.

22         My client is charged with money laundering for two

23 transactions that involved $75,000 each.  Two.  He hasn't been

24 charged with health care fraud.  He hasn't been charged with

25 conspiracy to commit health care fraud.

1      And what you're going to find out, through the

2    efforts of both myself and co-counsel, is that Mr. Rafferty was

3    absolutely correct, these insurance companies didn't like the

4    fact that they hadn't paid attention to what they were doing,

5    and the contracts allowed what our clients were doing.

6      And instead of attempting to work through that

7    process, and instead of attempting to -- to figure out some

8    kind of accommodation, what they did was turn a contract

9    dispute into an alleged crime.  That's not how we're supposed

10    to operate here.

11      I'm not only going to ask you to pay close attention

12    to the evidence that's presented, all of it, I'm also going to

13    ask you to pay attention to what you're not shown, and why,

14    because that's just as telling as what the evidence does show.

15      Ask yourself why it -- the FBI, after having a server

16    for eight months, the federal government having a server for

17    eight months, says, Yeah, nothing on there, but then my

18    co-counsels take that and find out that there's literally

19    hundreds of thousands of records?  Why?  Federal government

20    can't crack that?  That's not believable.

21      The government isn't going to be able to point to any

22    specific law that says that what the billing companies or the

23    owners of these labs did was illegal, because it wasn't.

24      The idea here at this point, I guess, is, Well,

25    there's just so many claims that the insurance companies

1    couldn't possibly be -- couldn't possibly keep up with the

2    number of them.  It's insane.

3            You're also going to hear, specifically with Sean

4    Porter, what his job was with TYSI and with Pinnacle.  I submit

5    to you that what he is doing is the same thing that anyone else

6    on that side of the room is doing, which is doing their job.

7            Did some of these people make a lot of money?  Sure.

8    Thankfully we live in a country where that's not yet criminal.

9    But, instead, these insurance companies want to use the

10    criminal law to resolve a billing dispute.

11            Like I said, there's not just reasonable doubt here.

12    There is very obvious doubt here.

13            I submit that once we're done with all the evidence

14    and you retire to the jury room, you go into your

15    deliberations, you're going to look at the charges against

16    Mr. Porter and you're going to find that the only reasonable

17    verdict on both the conspiracy to commit money laundering

18    charge and the two substantive money laundering charges is not

19    guilty.  And that's because they weren't moving illegal money

20    and no one agreed to do so.

21            Thank you.

22            THE COURT:  Thank you, sir.

23            All right.  Ladies and gentlemen, we are going to

24    take our lunch break now.  We will take an hour lunch break.

25    That means -- if you could be back in the jury room, ready to

## **CERTIFICATE**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 6th day of July, 2022.



                        s/Shannon M. Bishop
                        Shannon M. Bishop, RDR, CRR, CRC

*Volume XIX*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

    Plaintiff,                   Case No. 3:20-cr-86-TJC-JBT

vs.                              June 21, 2022

JORGE PEREZ, et al.,             8:52 a.m.

    Defendants.                  Courtroom No. 13A

_____

JURY TRIAL PROCEEDINGS
(VOLUME XIX)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT COURT JUDGE

COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan Street, #150
        Jacksonville, FL  32202
        Telephone:  (904) 549-1307
        dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

     **ANDREW TYSEN DUVA, ESQ.**
     US Attorney's Office - FLM
     300 North Hogan Street, Suite 700
     Jacksonville, FL  32202

     **GARY A. WINTERS, ESQ.**
     United States Department of Justice
     1400 New York Avenue NW
     Washington, D.C.  20902

     **JAMES V. HAYES, ESQ.**
     Department of Justice, Criminal Division, Fraud Section
     1400 New York Avenue, N.W.
     Washington, D.C.  20902

COUNSEL FOR DEFENDANT JORGE PEREZ:

     **THOMAS M. BELL, ESQ.**
     Thomas M. Bell, PA
     301 West Bay Street, Suite 1460
     Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

     **RICHARD J. LANDES, ESQ.**
     Richard Landes, Esq.
     736 2nd Street North
     Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

     **BRIAN T. RAFFERTY, ESQ.**
     BakerHostetler
     1170 Peachtree Street NE, Suite 2400
     Atlanta, GA  30309-7676

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

     **SETH SCHWARTZ, ESQ.**
     **ALBERT J. TASKER, IV, ESQ.**
     Schwartz Law Group, PA
     10365 Hood Road, Suite 105
     Jacksonville, FL  32257

*Volume XIX*

COUNSEL FOR DEFENDANT SEAN PORTER:

      **CALEB D. ROWLAND, ESQ.**
      Rowland Law
      2130 Riverside Avenue
      Jacksonville, FL  32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

      **STEVEN H. SADOW, ESQ.**
      **VINCENT ALBERT CITRO, ESQ.**
      Steven H. Sadow, PC
      260 Peachtree Street NW, Suite 2502
      Atlanta, GA  30303

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

      **JOSHUA SABERT LOWTHER, ESQ.**
      Lowther Walker, LLC
      Centennial Tower
      101 Marietta Street NW, Suite 3325
      Atlanta, GA  30303

COUNSEL FOR DEFENDANT AARON ALONZO:

      **DARCY D. GALNOR, ESQ.**
      Galnor Shumard, PA
      121 West Forsyth Street, Suite 610
      Jacksonville, FL  32202

T A B L E   O F   C O N T E N T S

<u>Page No.</u>

PROCEEDINGS:

Closing Argument by Mr. Bell...................... 69
Closing Argument by Mr. Landes................... 108
Closing Argument by Mr. Rafferty................. 125
Closing Argument by Mr. Schwartz................. 159
Closing Argument by Ms. Galnor................... 189
Closing Argument by Mr. Lowther.................. 199
Closing Argument by Mr. Rowland.................. 207
Closing Argument by Mr. Sadow.................... 218
Rebuttal Closing Argument by Mr. Duva............ 250

1          THE COURT:  Mr. Schwartz, I believe you're up.

2          MR. SCHWARTZ:  Yes, sir.  Thank you.

3          THE COURT:  Welcome back, ladies and gentlemen.

4          MR. SCHWARTZ:  Repeatedly through this case you've

5     seen money, money, money.  They talked about it when they

6     started.  The first words out of their mouth, 1.4 billion,

7     400 million.

8          The insurance companies talked about it.  You saw

9     slides about it.  You heard witness after witness talk about

10    it.

11         What the government's trying to do is evoke your

12    emotion, because when you're emotional you're not thinking

13    clearly.  You're responsive based on that emotion.

14         But what we're trying to do is get you to think about

15    the facts, think about all the testimony you heard, think about

16    federal law, and what is lawful and authorized and legal.

17         Federal law allows pass-through billing.  You heard

18    the experts.  You heard Mr. Thomas.  42 U.S.C. 1395(l), CMS

19    guidelines, the gold standard when contracts are silent as to a

20    situation, how it's interpreted.

21         This case is full of reasonable doubt, clear doubt.

22    There's no fraud.  There was no intent to commit fraud.

23    There's no money laundering.  There's no false statement or

24    omissions of material information.

25              And in the end the insurance companies just cram down

1    that reimbursement rate.  They don't have the vehicle to

2    continue.  They were just worried about how much they were

3    paying.

4            And you've seen evidence on that.  You've heard the

5    testimony.  Proof beyond a reasonable doubt is proof so

6    convincing you would be willing to rely and act on it without

7    hesitation in the most important of your own affairs.  Anything

8    less than that is reasonable doubt.  And, again, this case is

9    full of it.

10            Now, Mr. Porter, Mr. Jim Porter, did not do this on

11   his own.  He didn't create any of this on his own.  He heard

12   about an organizational idea and he went to lawyers.  You heard

13   Mark Thomas testify.  You heard him testify that other lawyers

14   were involved also.

15            And Mark Thomas talked about a scenario where the

16   idea that a laboratory can contract with a rural or critical

17   access hospital to test their samples is absolutely authorized

18   by federal law.  It's called under arrangement.

19            And under arrangement is not a very specific way of

20   doing things.  It's more of a fluid way of doing things.  And

21   there's certain things that need to happen to make that

22   authorized.  You heard the same from expert Michael Arrigo.

23            So the scenario is that a hospital and a lab talk to

24   each other in contracts for the lab to run testing.  The

25   samples can be sent directly to the laboratory.  It doesn't

1   have to be sent to the hospital.

2         The lab will do the testing and provide samples

3   through the LIS system, the lab information system.  That's the

4   same system that the hospital uses to put the data in about the

5   testing.  And when they do that, they find out about the

6   providers, the doctors, through their NPI numbers.

7         The lab then provides the test results.  The hospital

8   then bills it the only way the hospital is lawfully allowed to

9   bill it, on a UB-04, or its equivalent CMS 1450, or the 837I

10  you heard so much about.  And when the hospital bills those

11  claims, it must use its own NPI and its own tax ID numbers.

12        Mark Thomas, Michael Arrigo talked about how it has

13  to be done that way pursuant to federal law.  And that's what

14  was done in this case.

15        So the billing is done and it's sent to the insurance

16  companies.  The insurance companies then pay the hospital.  The

17  hospital then pays the laboratory whatever their agreed-upon

18  rate is, and they keep the difference.

19        Now, that's not the only model that was going on,

20  because different hospitals were at different levels in this

21  process.

22        Another model was the idea that a hospital was

23  building its toxicology lab.  Millions of dollars were put into

24  the lab at Putnam to get it up and operational, with the idea

25  that the hospital then would handle its own testing and

1  wouldn't need that under arrangement scenario anymore.  But

2  that doesn't make the under arrangement improper or unlawful.

3          So while the under arrangement scenario is going on,

4  Putnam is building out its lab, to the tune of millions of

5  dollars, putting in the best equipment, state of the art, using

6  PhDs to run that lab.  Their personnel are being trained at the

7  top levels.

8          And the idea was for that lab to become operational,

9  understanding that the day that it opened it wouldn't be at 100

10 percent.  And to think so is unreasonable.  It takes a little

11 bit of time to get something running to full capacity.

12         Now, you've heard lots of testimony about that lab

13 opened up in the beginning of February.  Before then they were

14 running an under arrangement model.

15         Mark Thomas said that that was authorized by federal

16 law.  Mark Thomas, who is a board certified specialist in

17 health law with the Florida Bar, one of only 128 lawyers barred

18 in Florida through the Florida Bar, out of 128,000 barred

19 attorneys in Florida.  He is literally one of 1,000.

20         You heard about his experience with the Attorney

21 General's Office prosecuting Medicaid fraud.  You heard about

22 his experience with AHCA, running that portion of AHCA which is

23 responsible for licensing physician offices and clinics

24 throughout the state of Florida, a state agency just like the

25 Florida Attorney General's Office.

1        You heard about him being appointed as a Special U.S.

2   Attorney to prosecute health care fraud issues in the Southern,

3   the Middle, and the Northern Districts in the federal courts

4   for the state of Florida.

5        This is not some guy that was found on some corner in

6   a strip center.  This is a specialist that understood the

7   situation, that reviewed what Mr. Porter told him, and that

8   said this is absolutely authorized.  Mr. Porter followed that

9   advice to the letter.

10        The government has discussed Mr. Thomas' opinion at

11   length.  And I want to show that to you.  I believe it is 69 --

12   Government's Exhibit 69, I believe.  But I want you to pay

13   attention to some important parts of this opinion.

14        They want to try to sell you that this opinion is

15   about testing.  It's not.  Specifically it asked about

16   Pinnacle's market and promotion, to market and promote the

17   clinical laboratory toxicology testing services of Putnam

18   County Memorial Hospital in Missouri to independent physicians.

19        Now, this is dated November 29, 2016.  It's very

20   important.  Because the under arrangement model was going full

21   throttle at Putnam at this time.  But what else was happening?

22   Putnam's lab was being built and was expected to come online

23   roughly about February.

24        So, again, when we look at this opinion, it talks

25   about Pinnacle's marketing and promotional activities.  It

1  doesn't say Pinnacle testing for Putnam, because this is a

2  different model.  This is what happens after the under

3  arrangement is already going.  This is what happens when

4  Putnam's lab comes online.

5          Pinnacle will be merely educating physicians as to

6  the benefits of Putnam County Memorial Hospital.  It's my

7  understanding that Pinnacle will market and promote PCMH's

8  toxicology testing to independent physicians who may order such

9  testing for their patients.

10         PCMH will provide toxicology testing for the

11  physicians' patient specimens.

12         And it goes on how PCMH will send the clinical test

13  report results to the physicians and so on.

14         It's my understanding that the marketing contract

15  between PCMH and Pinnacle is -- and it goes on to what that

16  marking contract will be.

17         And the reason this is being done in -- November

18  29th, 2016, is because it takes time to get the individuals in

19  place and create this business model to promote Putnam's

20  testing.

21         He ends with, I do not perceive any substantial legal

22  risk in the proposal, but I do perceive potential business

23  risk.  While the proposed arrangement appears comfortably

24  legal, third-party payer credentialing limitations could most

25  certainly preclude reimbursement.

1          To the extent any commercial payer refuses to pay

2     PCMH for its toxicology service, Pinnacle, in turn, will not be

3     paid for its marketing and promotional services.

4          Now, what we know about 141 claims is that they are

5     nonpatient claims, meaning that somehow the hospital, when it's

6     running its own toxicology lab, would have to reach out to

7     clinics and practitioners throughout the country to say that,

8     We are a full-service toxicology lab and we can take your

9     samples, test them, turn them back around to you, and send you

10    the results quickly.

11         You've got to get somebody out there to let people

12    know.  That's the marketing.  That's the promotional services.

13    This is not a situation where you put an ad on TV, because

14    you're targeting a very specific demographic, clinics and

15    practitioners, and you say, Listen, we've got a lab, services

16    that you can use, send us your sample, we'll turn it around

17    quick, you'll be very happy with us.

18         That's what the purpose of that opinion was.  It

19    wasn't about Putnam has to test and samples had to go to Putnam

20    to invalidate this under arrangement situation.

21         The under arrangement was working completely fine and

22    authorized.  And this was the secondary part of that, to get

23    Putnam County online with its own lab, so it could do it

24    itself.

25         The under arrangement was never intended to be

1   permanent.  Millions of dollars were put into that lab to help

2   the hospital.

3          You heard both Mr. Arrigo and Mr. Thomas say samples

4   could come from anywhere.  There wasn't any geographic

5   limitation.  There wasn't any limitation to volume of samples.

6   So long as the data was inputted by the hospital into the LIS,

7   which is undisputed at this point, it was fine.  And that's

8   what happened.

9          There were over 1,000 independent physicians, over

10  1,000, that didn't know each other, that didn't have ties to

11  each other, that were ordering these tests based on the

12  physician's own independent medical decision-making, that these

13  physicians felt it was appropriate to order these tests, order

14  confirmations when they wanted to, order screens when they

15  wanted to.  Nobody made them do that.

16         And, again, I believe most importantly -- the idea of

17  the billing and how that had to be done, you saw testimony or

18  heard testimony from Mr. Thomas and Mr. Arrigo that the

19  hospitals had to bill it this way.  That's based on CMS

20  guidelines, federal agencies, federal rules.

21         They had to use their NPI.  They had to use their

22  EINs.  And there's not a place on the 04 for any more

23  information.  And I submit to you that if the government wanted

24  to put more information on those 04s, they would amend their

25  governmental form UB-04.

1          All of this information is reasonable doubt as to

2    whether Mr. Porter acted to intentionally deceive or omit

3    material information from anybody.

4          Again, he went to a super qualified attorney, one of

5    128 in the state of Florida, 128, to get this information.  He

6    did disclose materially what was happening, fully disclosed it,

7    and said, Am I okay to do this?

8          And Mark Thomas said, Yes, as long as you do it this

9    way, which has been explained, and Mark Thomas testified to,

10   and Michael Arrigo agreed with, absolutely lawful, absolutely

11   authorized.

12         You saw the lab contracts.  These contracts were

13   prepared by attorneys.  These were not Google contracts.  You

14   can read them and see that it's not layperson language.

15         You heard Mark Thomas talk about working with other

16   lawyers.  A lot of people with a lot of specialized knowledge

17   looked at this situation and gave it a thumbs-up and said it is

18   absolutely authorized under federal law.

19         Again, Mr. Michael Arrigo talked about this under

20   arrangement model.  He talked about a transitioning model where

21   the under arrangement continued while the lab was being built

22   out; Michael Arrigo, who was hired by the Department of Justice

23   on three separate occasions to give opinions.

24         He agreed that the way this was billed was

25   appropriate and was authorized.  The 141 code put the insurance

1    companies on notice that this was a reference lab billing.

2              But what did you hear from Dr. K?  The insurance

3    companies weren't paying attention to that.

4              Really?  I submit to you there's no more important

5    part of a UB-04 claim than the type of bill.  It tells the

6    insurance companies what's going on.  Is it an emergency room

7    visit?  Is it an inpatient or outpatient?  Or is it a

8    nonpatient?  It tells them exactly what's happening.  And Dr. K

9    says, Insurance companies weren't paying attention to that.

10   They weren't looking at it.

11             Well, you know what, their negligence in not looking

12   at something does not create fraud, an intentional misstatement

13   or omission by Mr. Porter.  It just doesn't.  It was disclosed.

14             And the insurance companies cannot close their eyes

15   and plug their ears and say, Nah, nah, nah, I didn't hear you;

16   therefore, it doesn't exist.

17             It doesn't work that way.  It was fully disclosed.

18             And when Michael Arrigo is testifying to you, he's

19   explaining where his opinion comes from.  He's well researched,

20   over 80 citations to authority.  He doesn't say, like Dr. K

21   said, It's my opinion, and since other people come to me for my

22   opinion, therefore, I must be right.

23             No.  He says, I look at federal law.  I look at

24   federal rules.  I look at what's really happening in the health

25   care business.  I look at all of these different bases of

1   authority in the environment.  And then from that I put

2   together my opinion.  That is a sound opinion.

3          People ask me what the weather is going to be like

4   all the time.  Most of the time I'm wrong.  But just because

5   people come to me about, What do you think the weather is going

6   to be like, doesn't make it right, doesn't make me all knowing.

7          Michael Arrigo backed up what he was saying.  Mark

8   Thomas backed up what he was saying, from external sources,

9   including federal law and federal rules.  Dr. K didn't.  He

10  said, Because people come to me for my opinion, therefore, it

11  is.  Ask yourself why.

12         This was not something that was pulled out of a

13  vacuum.  This has been going on for over 15 years, from what

14  Dr. K said.  Pass-through billing is nothing new.

15         So I submit to you if there was something that

16  specifically said that you can't do it, some kind of law, or

17  rule, or code, they'd have brought it up.

18         Can I have 35F, please.

19         Thank you.

20         We've seen this e-mail over and over.  One of my

21  co-counsel went over it.  But what I want to focus on is the

22  top part.  And this is the e-mail where Heather Burch says, We

23  can't hold them to the pass-through rule because there's

24  nothing in the contract about it.

25         But, more importantly, James Balcom -- and you heard

1    his testimony, when he sat right there and talked to you, Just

2    wondering if there is/was a general rule or guideline that

3    covered this issue, even if it wasn't spelled out in a specific

4    contract.  Asking because I have no idea.

5            And when I asked him about that, if he ever got a

6    written rule or policy on it, what was his answer?  No.

7            So that doesn't exist, at least within RightCHOICE,

8    Anthem, Blue Cross Blue Shield, yet somehow these defendants

9    are supposed to know -- they're supposed to figure it out

10   somehow.  I have no idea how they're supposed to, but that's

11   what the government wants you to believe.

12           Mr. Balcom, if you recall, was a retired DEA agent.

13   He knows how to investigate something.  He was looking for the

14   general rule or guideline that covered this issue.  And he

15   never got it.  If it existed, somebody would have said, Here it

16   is.  It's right here.

17           And then that same idea, when Dr. K was testifying --

18   the government showed you a provider manual.  And in that

19   provider manual it said pass-through billing is prohibited.

20   The provider manual was from 2015.  They highlighted that.

21           But where was it from?  Colorado.  They didn't tell

22   you that.  That came out when I was questioning Dr. K.  And

23   what did Dr. K say about that?

24           The providers are responsible for the contracts and

25   provider manuals in their home state.  And he acknowledged in

1    this case we've got hospitals in Missouri, Georgia, and

2    Florida.  Nobody in Colorado.  And the labs are in Georgia and

3    Florida.  Nobody in Colorado.

4            Ask yourself why the government didn't bring it out.

5    This is a Colorado manual and we know it doesn't apply, but

6    let's look at this.

7            Because they were hoping you wouldn't pick up on it

8    and nobody else would.  When does it show up?  In Missouri's

9    manual in September of 2017, well after the conduct in this

10   case is done.  Then it shows up.

11           But you know what the Colorado tells me -- or the

12   Colorado, excuse me, manual tells me?  It tells me that Blue

13   Cross/Anthem understood that this was a potential issue, and

14   they knew it existed.  And if they wanted it in their Florida,

15   Georgia, or Missouri manuals, they could have put it in there.

16   In fact, they could have cut and pasted it in there.  But they

17   didn't.

18           And, remember, this was not anything new or novel.

19   Dr. K said this has been going on for a long time, over 15

20   years.  It's been known.

21           Mr. Arrigo talked about TOB 14X, 141 claims, these

22   reference lab nonpatient claims.  And he talked about the fact

23   that they're not obscure and they're not hidden.  And we put up

24   a demonstrative -- we can take this down, please.

25           Thank you.

1           And if you recall this when Mr. Arrigo was

2   testifying, we put up a demonstrative that talked about the 14X

3   bill claims, the 141s.  And it occurred -- in 2017, 12.2

4   percent of all laboratory claims were a type 141, 12.2 percent,

5   almost 14 million individual claims.

6           This is not something that's hidden or obscure.  This

7   is happening all over the place out there.  And Mr. Arrigo

8   talked about it.  Dr. K acknowledged that pass-through billing

9   was nothing new.

10           So if the insurance companies wanted to prohibit it,

11   they could have.  They didn't.  And now, on the back side,

12   they're coming back and saying, Oh, well, maybe we should have

13   done more, but we didn't; therefore, we want to create a

14   criminal situation and say to you that these individuals failed

15   to tell us about it or omitted material information that we

16   didn't know about it at the same time Dr. K is saying, They

17   weren't paying attention to the 141, which, again, I submit to

18   you is probably the most important piece of that UB-04, because

19   that's where that claim starts, because if it's something

20   different, let's say -- if it's a 121 that deals with inpatient

21   and it's a claim for surgery, if it doesn't say that and it

22   says nonpatient 141, but there's a surgical claim in there, and

23   there's a claim for keeping somebody in the ICU for a week,

24   they're going to wonder, Wait a minute, why are they asking us

25   to pay for an ICU stay and surgery for a nonpatient?  This

1    doesn't make any sense.

2           I submit to you they were paying attention to that

3    141, because they wouldn't know what kind of claim anything

4    was, and it wouldn't make any sense to them on why to pay

5    something or why not to pay something.

6           But the easiest thing for Dr. K to say, They weren't

7    paying attention to it, because he can't get up there and

8    explain, if they were paying attention to it, how they didn't

9    know.

10          But, again, it's not obscure.  12.2 percent of all

11   laboratory claims, almost one in eight, were nonpatient 141

12   claims in 2017.

13          You heard about the in-network lab Quest.  If this

14   was in-network, none of this would have happened.  That's what

15   the insurance company witnesses were saying.

16          Well, let me remind you about this contract.  Quest

17   Diagnostics, the in-network lab.  Hospital third-party billing

18   agreement.

19          For purposes of this agreement, the terms

20   "inpatient," "outpatient", "nonpatient" have the definitions as

21   set forth in the applicable Medicare regulations.

22          Now, the government wants you to believe that CMS

23   guidelines, Center for Medicare & Medicaid Services, don't

24   apply, because this is commercial.  That's not what Quest

25   thinks.  That's not what this says.

1          CMS guidelines are the gold standard.  That's what

2   all the payers look to for definitions and for guidance.

3          Each of the following is a "third-party payer" within

4   the meaning of this agreement.

5          It talks about Medicaid, Medicare, and commercial

6   payers.  That's the way the health care space works.  They look

7   to federal law and federal rules to define these important

8   terms.

9          It talks about for each test order submitted by the

10  hospital or testing service to be performed by Quest, the

11  hospital shall be responsible for informing Quest Diagnostics

12  as to the status of the patient as an inpatient, outpatient, or

13  nonpatient.  This is a specific designation.

14         The testing services, it talks about commercial

15  payers, outpatients and nonpatients only.  You can't do it with

16  inpatients.  It talks about Quest Diagnostics will not bill

17  third-party payers for testing it does not perform under the

18  agreement; for example, tests that are referenced to another

19  laboratory, including, without limitation, a Quest Diagnostics

20  Center of Excellence, not specifically included as a provider

21  under this agreement, which means that if they add another

22  reference lab on top of themselves, then they can bill it the

23  same way.

24         So you literally could have reference lab on

25  reference lab on reference lab doing the tests and it's still

1    authorized, as long as they add it.

2          This was agreed to with Putnam County Memorial

3    Hospital by its CEO on November 2nd, 2012, years before these

4    defendants and my client, Mr. Porter, got involved with

5    reference lab under arrangement testing.

6          Again, Quest, the in-network lab that we heard would

7    know to bill direct on a CMS 1500.

8          No, they're doing the same thing.  And why?  Because

9    it is authorized under federal law.  And the agreement --

10       (Counsel confer.)

11          MR. SCHWARTZ:  It had been going on since 2012.

12          And, more importantly, after my client and these

13    defendants stopped, it continued to go on.  And you saw the

14    evidence that was admitted where the testing that was done was

15    sent to Quest.  Quest didn't bill it directly on a 1500 like

16    the insurance company said that they would have.

17          No, they did the testing and they sent the results.

18    And then they sent the invoice to the hospital.  The hospital

19    then billed it on a UB-04, or its digital equivalent, the 837I,

20    with the hospital's own NPI and EIN, the same exact thing that

21    was going on with these defendants.

22          The hospital then sent the claim, received the money,

23    paid Quest whatever their agreed rate was, kept the difference,

24    and did it again.

25          Now, there's a minor distinction, but it's of no

1    consequence.  And the government wants to make a big deal about

2    this.  With Putnam they did it with outpatients.  But there's

3    no prohibition doing it with nonpatients.  There's a

4    distinction without a difference.  And, in fact, this contract

5    talks about it being okay with nonpatients.

6              If it was so illegal, if there was so much fraud, if

7    there was so much misrepresentation and omission, why is it

8    still happening?

9              And if you remember Ms. Pickens, who is a CEO, said

10   that the insurance companies are well aware of this.  It is not

11   a violation of any of their agreements.  And, in fact,

12   RightCHOICE attorneys knew about it.  And it was still going

13   on.

14             The reason it's going on is because it's entirely and

15   completely lawful.  There's nothing illegal about it.  The

16   insurance companies may not like it.  They may want something

17   different.

18             But, unfortunately, for them, this is federal law.

19   You heard Mark Thomas:  You don't like it, call your

20   Congressperson.

21             They can change it.  They've chosen not to.

22             Reasonable doubt, did Mr. Porter act to intentionally

23   deceive an insurance company or intentionally omit information

24   to prevent them from understanding what's going on?  The answer

25   to that is absolutely not.

1          Again, it's still happening with the insurance

2   companies' own in-network lab, Quest, that they told you would

3   not do this.  But they do it because it's legal, lawful,

4   authorized.

5          The government wants to try to tell you that this is

6   so clear, easy, you can see all this stuff.  Well, it's clear

7   as mud.  In fact, Dr. K was paid over $100,000 to try to

8   explain how it's so clear and, again, couldn't come up with one

9   citation to why his opinion was right.  Couldn't say, Look at

10  this statute.  Look at this federal rule.  Look at this

11  authority.  Nope.  My opinion.  I know what I'm doing;

12  therefore, I'm right.

13         You saw the problems with this investigation.  You

14  saw the problems with the insurance companies' investigation.

15  You saw the problems with the data.  The case agent, the guy

16  that was in charge of running this investigation up until the

17  time of indictment, FBI Agent Robert Schwinger, went to work

18  for Florida Blue.

19         Now, I submit to you:  Why would Florida Blue hire

20  somebody that botched an investigation?  Well, those problems

21  in the investigation all went to the benefit of the insurance

22  company, all of them.

23         They didn't benefit the defendants.  They benefitted

24  the insurance company.  And the insurance company got what they

25  wanted, an indictment, so that they could go backwards in time

1    and say, You know what, we messed up, but we're going to try

2    fix it backwards in time.

3            And so what happened?  The agent in charge of this

4    investigation, the case agent at the time, that produced all

5    the information that led to an indictment, was given a job with

6    their Special Investigations Unit at Florida Blue.  He was

7    rewarded.

8            I'm not going to talk about this too much, but let's

9    talk about code 22, because it's important.  Code 22 is the

10   outpatient services.  You heard from the witnesses.

11           You can't have a nonpatient claim, where an

12   individual never shows up on a campus hospital -- or the

13   hospital's campus, and an outpatient claim at the same time.

14           They are diametrically opposed.  It is like being up

15   and down or wet and dry at the same time.  It is impossible.

16           More importantly, you heard that code 22 has no place

17   on a UB-04 -- there's not a place to put it -- yet the data

18   that the insurance companies provided has code 22 all over it.

19   And every one of those claims is a 141 claim.  You can't have a

20   nonpatient and an outpatient at the same time.

21           The majority of them admitted that.  They also

22   admitted that the insurance companies created that code that

23   investigators relied on.  Investigators from the insurance

24   company relied on it.  And they thought it was a slam dunk.

25           You heard Mr. Rafferty talk about it.  They thought

1    there's a smoking gun.  Aha, the defendants billed all of these

2    claims as if people were at the hospital peeing in cups.  And

3    we know that that's not true.  We got them.

4             Yet that data was created by the own insurance

5    companies that those investigators worked for.  That's what led

6    this investigation.  That's what led this case.  That's what

7    led this indictment.  And none of it is true.  None of it.

8             You heard the insurance company say that it was

9    created by them.  And then they tried to spin it a little bit,

10   saying, Oh, well, what it really means is that the testing was

11   done at the hospital.

12            No, it doesn't mean that.  We showed you all the

13   definitions.  No, it means outpatient services, somebody

14   appeared at the hospital, boots on the ground on a hospital

15   campus.  And we know that that's not true.

16            And we also know that none of the billing that was

17   provided by the defendants had code 22 on it, yet all of the

18   claims data had it on there.  The insurance company just made

19   it up.

20            Let's talk about Dr. Waller for a minute.  He was the

21   one that got up there and said that the thousand independent

22   doctors, they don't know what they're talking about, and I'm

23   going to look at some data and I'm going to decide that none of

24   these claims, or the majority of these claims are not medically

25   necessary, just, shoo, I'm Dr. Waller, so I know what I'm

1    talking about.

2            A thousand-plus independent doctors having

3    independent medical decision-making responsibilities and

4    capabilities made decisions to test the way they did.

5            You heard Dr. Solomon, one of the first witnesses you

6    heard from the government put up:  When I do a screen, I want a

7    confirmation every time.  I need the screen quick, because that

8    helps me with my diagnosis and patient treatment.  I want the

9    confirmation to see what's going on, kind of a trust-but-verify

10   situation.  Because I want to know:  Is the screen accurate?

11   Did somebody try to mask the screen?  Did somebody take a

12   little bit of a pill and scrape a little bit into urine so the

13   screen shows positive, but when I get the confirmation it's

14   negative?  Or how much of that drug is in their system?

15           Because when they're providing their services and

16   prescribing different drugs, they can overprescribe something

17   not knowing what's going on.  So he said, As long as I get the

18   confirmation before I see the patient next, I'm good.

19   Typically it's 30 days.

20           But he got right there up and told you, government's

21   witness, Dr. Solomon, that I ordered these because I need them.

22           Dr. Fender, she was the one that was Putnam's lab

23   director.  You can't just look at an order and determine if a

24   doctor should have determined it or not.  You need to call the

25   doctor.

1         And then she said, even her, as a doctor, I will only

2    call physicians that I know.  I won't call them when I don't

3    know.  You need to contact the doctor to find out what's going

4    on.

5         Did Dr. Waller call any doctors?  No.  I don't need

6    to is what he said.  Don't need to.

7         Now, the government gave him two physicians that were

8    witnesses for the government, and he looked at that

9    information.  But all the other ones, over 1,000 other doctors

10   throughout the country that are independent and not tied to

11   each other in any way, did they pick up the phone and call them

12   and say, Hi, I'm Dr. Waller.  I'm doing a little investigation.

13   Would you mind talking to me?

14        He was paid by the hour.  You heard him.  He charged

15   over $120,000 just for him, and adopted information in a report

16   from Dr. Clark, who charged the government about $325,000, so

17   together about $450,000, because this is so clear anybody would

18   know what's going on, but, most importantly with all this,

19   Dr. Waller said he didn't have the provider information.  He

20   didn't get the NPI information in his data set.

21        Ask yourself why.  He needs that information.

22        Now, he didn't ask for it either.  He could have

23   said, Hey, these things were prescribed by doctors all over the

24   country.  I think I should talk to some of them.  He didn't say

25   that to the government.

1          But you know who did get the provider information?

2    Dr. K did.  Dr. K didn't need it.  Why is there different types

3    of information going to these experts?  Ask yourself that.

4          When I asked Dr. Waller about his methodology and

5    being peer-reviewed, his snarky response was, I wasn't aware I

6    was writing a paper.

7          You're not, Dr. Waller.  You're doing something much

8    more important, much more important than writing a paper.

9          He agreed that doctors have a difference of opinion.

10   He agreed that people get second opinions for a reason.  He may

11   think what he wants to think, but the physician on the ground

12   treating the patient knows what they're doing.

13         And to suggest that one individual can get up here

14   and look at some data sets and make a determination that all of

15   the other doctors in this case, over 1,000 of them, that

16   reviewed patient information, have the patient in front of

17   them, knew their history and prescribed what they did somehow

18   don't know what they're doing and are wrong is preposterous.

19   It's asinine.  That's more reasonable doubt.

20         The government has brought up this idea about some of

21   the labs bill 98 percent of their claims as confirmations, 98

22   percent.

23         Well, you heard testimony about how you can't bill a

24   screen if it was done by the clinic, by the physician.  And if

25   all they're asking for are confirmations, then that's what you

1    can bill.  That's it.

2            But you also heard testimony that the screens are run

3    in every case to verify the validity of the samples for the

4    confirmation.  You have to run a screen to make sure there's no

5    adulterants in it or anything that's going to mess up that

6    sample for the confirmation.  So they did.  And they did not

7    bill it, which is why only 2 percent of the screens were

8    billed.

9            But you know what, if they were trying to commit

10   fraud, and this was only about money to them, and they were

11   trying to misrepresent information, they would have billed

12   every single screen, too.

13           And what you would hear is, there's a perfect 50/50

14   on the screens and on the confirmations.  There were X numbers

15   of screens run and X number of confirmations.  And everything

16   that was done was billed.

17           Because you know what, they could have made a whole

18   lot more money by billing all of those extra screens.  They

19   didn't do that because it's not right to do that.  That would

20   be fraud.

21           So what?  They only billed what they were able to.

22   All of the other ones that they ran they didn't bill.  But they

23   ran them anyway, to make sure that the confirmation samples

24   were accurate.

25           COURTROOM DEPUTY:  Mr. Schwartz, you have 15 minutes.

1          MR. SCHWARTZ:   Thank you.

2          You heard a lot about the money trail.  There's

3    nothing hidden in this.  The accounts were opened up by the

4    individuals that were the owners of the company.

5          Their real dates of birth were used.  Their real

6    names were used.  Their real identifying information was used.

7    Their real addresses were used.  There were checks written

8    between companies.  There were wire transfers between

9    companies.  There were no piles of cash.

10         You didn't hear about millions of dollars switching

11   hands in cash.  You didn't hear about offshore transfers and

12   piles of shell companies where one company creates five others

13   and has accounts all over the world and moves money that way.

14   You didn't hear any of those things.

15         You didn't hear where there was a bunch of cash going

16   to some restaurant and money was coming out the other side to

17   make it look legitimate.  No.

18         All of this is right on its face.  Company A pays

19   Company B through a check.  And it's written that way.  It's

20   signed by the individuals that are the -- the owners or the

21   relevant parties.  It's deposited in American bank accounts.

22         There's no straw people.  You didn't see any checks

23   written to John Doe or Jane Smith or somebody else that has

24   nothing to do with anything.  You didn't see any witnesses that

25   were like, Oh, well, I received a million dollars from Pinnacle

1    and I don't really know what's going on, but they paid me money

2    to do that.

3           None of that happened.  Because they were running

4    this corporation the way that they knew how to correctly.  This

5    wasn't hidden.  This isn't some grand criminal enterprise.

6    They're not trying to hide anything from anyone.

7           Mr. Jim Porter is charged with conspiracy to commit

8    health care fraud and, I believe, 13 money laundering counts.

9    But, notably, what he's not charged with is a health care fraud

10   count, a substantive health care fraud count, something that

11   says, Look at this specific act, this specific thing, because

12   that is a violation of law.  Nope.

13          And it's not like they're trying to save space,

14   because they hit him for 13 money laundering counts.  Ask

15   yourself why.

16          They want to lump him in with a bunch of other people

17   and confuse the issues and say, Somewhere, something, somehow

18   he made an agreement to do something illegal.

19          He didn't.  This was an under arrangement situation.

20   Money was put into the hospitals to build their labs to make

21   themselves sufficient.  The billing was absolutely authorized

22   and lawful.  It was done the only way it could have been done,

23   the same way that Quest and Putnam are still doing it today.

24          There's reasonable doubt everywhere, everywhere.  The

25   contract issues that were brought up by the government, that's

 1    just a matter of interpretation.  There's nothing clear and

 2    unambiguous in there.

 3           Those are civil issues.  Those are not criminal

 4    issues.  They're civil in nature.

 5           The idea that the insurance companies weren't paying

 6    attention is unbelievable, they weren't paying attention to the

 7    141 code, the one thing that told them that these were

 8    reference lab billings.

 9           In one of the jury instructions you'll see the advice

10    of counsel defense that my client Jim Porter raises.  And

11    that's a good faith reliance on the advice of counsel.  Good

12    faith is a complete defense to the counts Jim Porter is charged

13    with.

14           And because the government must prove beyond a

15    reasonable doubt that he acted with the intent to defraud, good

16    faith is extremely important.  Evidence that Mr. Porter acted

17    in good faith and followed the advice of counsel is

18    inconsistent with that unlawful intent.

19           And you'll see in the jury instructions, Unlawful

20    intent has not been proved if a defendant, before acting, made

21    a full and complete good faith report of all material facts to

22    an attorney he considered competent.

23           I'd submit to you that Mark Thomas is an absolute

24    health care specialist.  To suggest that he's not competent is

25    ridiculous.  He is one of 128 health care specialists in the

1    state of Florida with the Florida Bar, out of 128,000

2    attorneys.  He has prosecuted fraud.  He knows what it is.  And

3    he listened to Mr. Porter and gave him advice.

4            Now, Mr. Porter received Mr. Thomas' advice as to the

5    specific course of conduct that was followed, and Mr. Porter

6    reasonably relied on that advice in good faith.

7            The government wants to tell you that Mr. Porter

8    didn't disclose all of the stuff.  No, he did.  You heard me

9    question Mr. Thomas up here.

10            The government wants to point to Mr. Thomas' opinion.

11    You just saw again that that's a marketing and promotional

12    opinion for when Putnam goes online with its own lab.  That has

13    nothing to do with the under arrangement model that was already

14    running and authorized.

15            The government wants to confuse you.  But it's not

16    confusing.

17            Mr. Porter fully disclosed what he was thinking about

18    doing to Mark Thomas.  Mark Thomas heard that, gave his advice

19    based on federal law, and Mr. Porter followed that advice.

20            And the information that you've heard in this case is

21    exactly what that advice was.  Pinnacle was going to partner up

22    with hospitals, with agreements to test the hospital samples.

23            Those samples could come from anywhere in the

24    country.  Those samples could be sent directly to Pinnacle or

25    the hospital.  And the hospital could forward them, whichever,

1    didn't matter.

2          The hospital would do the accession and put the data

3    into the LIS systems.  The hospital would do the billing.  The

4    lab would send the results to the providers.  The hospital

5    would receive the moneys from the insurance company, pay the

6    lab, keep the difference, and do it again.

7          That's what this is.  The hospitals would bill with

8    their own NPI and their own EIN.  The labs would do the

9    testing.

10          That's what this is.  That's what Mark Thomas

11    testified was absolutely lawful, and otherwise known as under

12    arrangement.  And that's what Michael Arrigo testified is

13    absolutely lawful and otherwise known as under arrangement.

14          There's no conspiracy to commit health care fraud by

15    Mr. Porter.  There's no money laundering by Mr. Porter.  The

16    government has absolutely failed to prove their case.  I submit

17    to you the only correct verdict in this case to Mr. Porter is

18    not guilty on all counts.

19          I thank you for your time and I thank you for your

20    service.

21          THE COURT:  Thank you, Mr. Schwartz.

22          Mr. Rowland?

23          MR. ROWLAND:  Your Honor, we've got a bit of a lineup

24    change.

25          THE COURT:  Okay.

```
 1              MR. ROWLAND:  Ms. Galnor I believe is going to go
 2    ahead and summarize now.
 3              THE COURT:  All right.  Ms. Galnor.
 4              MR. ROWLAND:  And just so the Court knows,
 5    Mr. Lowther will probably be going next as well.
 6              THE COURT:  Thank you.
 7              MS. GALNOR:  It's nice not to go last.
 8              May it please the Court?
 9              THE COURT:  Yes.
10              MS. GALNOR:  Counsel.
11              So a few weeks ago when we all first met, I remember
12    saying in my opening statement that this was going to be a long
13    ride.  I'm not sure that any of us fully appreciated then how
14    long that ride was actually going to be, but here we are at the
15    end, finally.
16              I also told you in my opening that I would be brief
17    and succinct and prepared in my questioning and my presentation
18    of my case on behalf of Mr. Alonzo.  And I hope I have lived up
19    to that.
20              I would also like to remind each of you the most
21    important thing I said in my opening statement.  And at the
22    time I yanked it from Mr. Rafferty.  And I'm going to do that
23    here again today.
24              I told you Mr. Alonzo didn't lie, he didn't cheat, he
25    didn't steal, he didn't misrepresent anything, and he didn't
```

1          Thank you.

2          THE COURT:  Thank you.  Mr. Rowland.

3          MR. ROWLAND:  Good afternoon.  I know you haven't

4   seen me in about six weeks.  I'm Caleb Rowland.  I represent

5   Sean Porter.

6          I'm going to echo what my co-defense counsel said,

7   thank you for the attention that you've shown during all this

8   testimony.  I know it's been a lot.  I've noticed that several

9   of you have been taking notes.  I know that Mr. Porter

10  appreciates that.

11         If you recall when I first talked with you in the

12  opening, I told you that the government's case basically boiled

13  down -- at least as to Mr. Sean Porter, basically boiled down

14  to throwing large numbers at you and expecting you to convict.

15         And what did they do?  They did exactly that.  I'll

16  show you two of their charts.

17         Your Honor, if I could approach and put this up so

18  y'all can see.

19         $1.4 billion in alleged fraudulent -- and what did

20  they show you?  A bunch of large numbers, including 952,000,

21  27.2 million, plus 80,000.  It wasn't even explained to you.

22  And then in terms of the actual charges against Mr. Porter, go

23  back to what I talked about earlier, two checks $75,000 each.

24         Now, I'm not psychic.  Don't ask me for lottery

25  numbers or picks on an NFL game.  The reason I told you that is

1    because that's all that they have, from the beginning.  That's

2    all they've had against Mr. Porter.

3            Now, the government also told you this morning, these

4    defendants were, quote, making more money than they should

5    have.  That's really what this boils down to.

6            The government had insurance company executives come

7    in and talk about the, quote, services that they provide their

8    members, as if they're doing something out of the goodness of

9    their heart.

10           Let's be perfectly clear.  Insurance companies are

11   not in the business of paying out claims.  They're in the

12   business of taking in premium payments and paying as few claims

13   as possible.

14           Florida Blue, Aetna, United decided they were paying

15   more than they wanted to, bottom line.

16           Now, I'm not going to go into a lot of the health

17   care fraud issues, because my co-defense counsel has already

18   done that.  And I anticipate Mr. Sadow will do that.

19           And I'm also not going to go into a lot of the jury

20   instructions, because you've already gone over them, and you're

21   going to have them.  You'll know what they say.  I would ask

22   you to think about a couple of things that are involved in

23   those.

24           And I appreciate the way -- I appreciate the way that

25   Ms. Galnor put it to you, in terms of the standard that the

1   government has to meet.

2          Proof so convincing that you would be willing to rely

3   and act on it without hesitation in the most important of your

4   own affairs.

5          Has any of the evidence that you've heard against

6   Mr. Porter -- and to be fair, he's been mentioned like six

7   times in six weeks.  Has any of that evidence risen to the

8   level that you would be willing to rely and act on it without

9   hesitation in the most important of your own affairs?

10          Now, throughout this trial the government has had the

11   burden of proving to you beyond a reasonable doubt that

12   Mr. Porter committed a crime.  That burden was theirs and

13   theirs alone.

14          I submit to you that you haven't heard any evidence

15   that reaches the level of being so convincing that you would be

16   willing to rely on it as to any of the defendants, but

17   certainly not as to Mr. Porter.

18          Mr. Hayes told you that this case is simple and there

19   is no doubt at all.  Well, one of the things I'll highlight for

20   you is if it takes two experts, $650,000 worth of time to

21   explain to you whether a crime has been committed or not, that

22   by itself is reasonable doubt.

23          And the biggest question here is:  Was there any

24   crime committed?  Based on the evidence the government has put

25   on for you, the answer to that has to be no.

1          The government didn't show you one law or regulation

2    that prohibits what the defendants in this case did.

3          And as to Mr. Porter, what did you hear?  He was an

4    employee responsible for setting up a reference lab.  No

5    evidence that he had any real involvement in the business side

6    of the lab's work.

7          Now, remember what Dr. Fender told you when she was

8    testifying about speaking with Mr. Porter when she was

9    concerned about this reference lab.

10          If you recall, she was talking about her blood

11    pressure being high.  And she said that -- after talking with

12    Sean Porter, my blood pressure lowered.

13          She felt like her concerns had been addressed.

14          The other interesting thing to me is that the

15    evidence shows that Mr. Porter was working to set up the exact

16    lab the government complains wasn't available for testing.  Of

17    course it wasn't.  It was being set up.

18          And Mr. Porter and his -- his brother Jim Porter

19    spent tremendous amounts of money to get a high-quality working

20    lab going at Putnam County.

21          Mr. Porter is charged with one count of conspiracy to

22    engage in money laundering and two counts of substantive money

23    laundering, meaning actual money laundering.

24          Part of what the government has to prove to you --

25    and this is contained -- the language here is contained both in

1    the jury instructions and in the superseding indictment.

2         But in terms of the substantive money laundering

3    counts, Counts Sixteen and Twenty-Two, one of the things the

4    government has to prove to you beyond a reasonable doubt is

5    that he knew that the funds involved in those two transactions,

6    those two $75,000 transactions, were the proceeds of some

7    illegal activity.

8         Now, knowledge or knowingly isn't, Well, he should

9    have known, or he could have known, or he probably knew.  He

10   has to have actual personal knowledge.

11        And for those counts that means that he knew that the

12   funds were the proceeds of some illegal activity.  In terms of

13   the conspiracy count, Count Eight, again, the government has to

14   prove to you that he knew when he agreed to engage in the

15   transaction the funds were the proceeds of illegal activity.

16        It took the government almost $700,000 to explain to

17   you why this allegedly was illegal.

18        Now, Mr. Schwartz went over the advice-of-counsel

19   defense, so I'm not going to belabor that point.  But there are

20   some questions that I think would be important for you to ask

21   yourselves while you're deliberating.

22        Did you hear any evidence of any agreement between

23   Mr. Porter and anyone else?  Did you hear any evidence that

24   Mr. Porter knew the government considered any of these payments

25   that he allegedly agreed to receive were for something illegal?

1    Did you hear about Mr. Porter trying to conceal those payments?

2          And, by the way, notice those payments were literally

3    written to him.  Okay?  He deposited those into an account for

4    a company that, when you look at our Exhibit 1, you'll see has

5    his name on it.  It's publicly available on a State of Florida

6    website.

7          Did you hear about the use of aliases of fake names?

8    Did you hear about hidden accounts, offshore accounts?  Did you

9    hear about Mr. Porter and his brother creating any false

10   documents?  Did you hear about sham investments, putting the

11   money into diamonds or art, crypto currency?  Did you hear

12   about any strawman account holders, somebody else holding on to

13   the money for him, any false information on any bank documents?

14         You didn't hear about any of that.  And you can use

15   that to determine the knowledge requirement.

16         You're going to see, if you look at Mr. Porter's

17   exhibit, that TYSI, LLC, his company, was created in 2013, over

18   three years prior to the events that are covered in the

19   indictment.

20         And, again, what evidence did you hear that convinces

21   you beyond a reasonable doubt?  And to be very clear, that's up

22   here.  Okay?  This isn't more likely than not.  This isn't

23   probably happened.  This is up here.

24         What evidence did you hear that convinces you beyond

25   a reasonable doubt that Mr. Porter knew the payments he

1  received were for something the government considered illegal?

2  That itself is reasonable doubt right there.

3          Now, one other thing that I brought up in the

4  questioning of Ms. Henderson, Kimberly Henderson, the FBI's

5  forensic accountant -- note that both of these are checks and

6  they're handwritten.

7          And if you recall Ms. Henderson's testimony, she said

8  that it didn't involve a wire transfer, didn't involve an

9  internet transfer, those checks were most likely

10  hand-delivered.

11          She also confirmed that the account that those checks

12  went into was located in Ocala, Florida.  And she confirmed

13  that the account that those checks came from was located in

14  Ocala, Florida.

15          The government has to prove to you that these

16  transactions affected interstate commerce for it to be a

17  federal crime.  They haven't done that.  They haven't met that

18  burden.

19          So putting aside all the other issues that there is

20  in the case, if you want to find something to hang your hat on,

21  there it is.

22          There is no evidence that those transactions affected

23  interstate commerce, meaning obviously between two states, or

24  foreign commerce, meaning between the U.S. and a foreign

25  country.  That's a minimum requirement for a conviction here.

1    And the government hasn't proven that to you.

2         If you think back to the testimony that Mark Thomas,

3    the attorney, gave, Mr. Porter and his brother relied on the

4    advice of counsel and followed their lawyer's opinion after

5    having informed that lawyer of the specific acts they planned

6    to take.  That's a complete defense.

7         Mr. Schwartz went over that when he was talking about

8    Jim Porter.  And, also, notice the sleight of hand here.  The

9    letter deals with marketing.  Mr. Thomas told you that he

10   orally gave his opinion on the under arrangement that Jim

11   Porter's lab, Pinnacle, was involved in, and HLP.

12        Now, as to the government's witnesses -- and these

13   are just things that kind of caught my attention during the

14   trial.  And I wrote them down.

15        On the health care fraud counts, you heard that the

16   insurance companies' own clearinghouses changed the information

17   that's sent from the providers before it ends up reaching the

18   insurance companies.

19        And, also, take into account that while the

20   investigation was ongoing, the government's own case agent went

21   to work for one of the alleged victims here, Florida Blue,

22   Robert Schwinger.

23        In case you're interested in what he looks like, my

24   understanding is he's sitting right back there now.  First time

25   he's been here.

1          You're the ultimate judge in terms of the credibility

2    of the government's witnesses.  Again, not going to belabor

3    that point.  But think about this, one of the government's star

4    witnesses couldn't be trusted not to get intoxicated before he

5    came in and testified to you, couldn't be trusted not to.

6          If you think about Michele Jordan, the attorney that

7    testified earlier in this case, why is it that the defense is

8    the one who's providing you with the text message, where she's

9    talking about how great this would be for the hospital?

10          And if you notice, every time one of the government's

11   witnesses would give them an answer they didn't want, you'd

12   start hearing about money again, large amounts of money.

13          Again, I'm not a psychic.  It doesn't take a psychic

14   to figure out that they're going to lean heavily on what they

15   allege to be fraudulent billing.

16          Now, after Judge Corrigan gives you your instructions

17   and you go back to the jury room to deliberate, the issues that

18   I brought up here and the issues that my colleagues have

19   brought up should be of the utmost importance for you to

20   thoughtfully, fully, and seriously consider.

21          Because as several of the defense counsel have told

22   you, this is the most important day of every one of these

23   defendants' lives.

24          There is simply insufficient evidence to convict

25   Mr. Porter of any crime.  And I say that because there is no

1    evidence of a crime being committed here.

2            We're asking you to hold the government to their

3    standard of proof.  We've all implicitly agreed by living in

4    the country past the age of 18 that there's certain rules that

5    we're going to play by.

6            And one of those is that if the government is going

7    to convict you of a crime, they have to prove beyond a

8    reasonable doubt that that crime occurred and that you did it.

9    Not maybe he did it.  Not he could have done it.  Not he most

10   likely did it.  Not he probably did it.  Beyond a reasonable

11   doubt he did it.

12           When you were sworn as witnesses [sic] you're

13   required to leave -- you weren't required to leave your common

14   sense at the door.  Ms. Galnor brought that up.

15           THE COURT:  You said sworn as witnesses.  Were you --

16           MR. ROWLAND:  I apologize.  When you were sworn as

17   jurors -- I misspoke -- you weren't required to leave your

18   common sense at the door.  Use that.

19           If you hold the government to their standard of

20   proof, beyond a reasonable doubt, I'm confident that you'll

21   return with a verdict of not guilty on all counts against

22   Mr. Porter and you'll send him home to his family.

23           Thank you.

24           THE COURT:  Thank you, Mr. Rowland.

25           We'll take a recess.  It's 3:17.  Let's try to come

*Volume XIX*

## **CERTIFICATE**

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 6th day of July, 2022.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC